# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SANTANDER BANK, N.A., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. |
| v. ) | 13-13161-FDS |
| ) | |
| BALDWIN REALTY, LLC; BRIAN J. ) | |
| STRASNICK; and CRAIG STRASNICK, in ) | |
| his capacity as Trustee of Cliff Road Realty ) | |
| Trust, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER ON
## MOTION TO DISMISS

**SAYLOR, J.**

This action arises out of a commercial mortgage transaction. Plaintiff Santander Bank, N.A. seeks to recover a post-foreclosure deficiency balance allegedly owed under loan documents executed by defendant Baldwin Realty, LLC, and guaranteed individually by defendant Brian J. Strasnick.

On September 9, 2014, defendants filed a counterclaim with their answer to plaintiff's amended complaint. The counterclaim alleges intentional interference with advantageous contractual and business relations; breach of the implied covenant of good faith and fair dealing; breach of the mortgagee's duty of good faith in conducting a foreclosure sale; and violation of Mass. Gen. Laws ch. 93A. Plaintiff has moved to dismiss the counterclaim for failure to state a claim upon which relief can be granted. For the reasons set forth below, the motion will be granted in part and denied in part.

## I. Background

### A. Factual Background

Unless otherwise noted, the following facts are presented as stated in the answer and the counterclaim.[1]

On July 27, 2006, Sovereign Bank (the predecessor to plaintiff Santander Bank, N.A.) provided a $2 million line of credit and an $800,000 term loan to Willow Medical Laboratories & Medical Center, a Massachusetts business trust. (Countercl. Ex. A). Baldwin Realty, LLC, guaranteed the obligations of Willow to the Bank. (*Id.*) The same day, Baldwin also executed a Term Promissory Note to the Bank in the principal amount of $4 million. The debts were secured, at least in part, by a mortgage on real estate located at 270 and 280 Union Street in Lynn, Massachusetts, which included a multi-tenant office building and two parking lots ("the Property"). (*Id.* Ex. A & ¶ 6). The lending arrangements were modified and revised multiple times. Beginning in 2010, defendant Brian Strasnick, the owner of Baldwin and Willow, guaranteed all of those debts in his individual capacity. (*Id.* Ex. A & ¶¶ 5, 7).

At some point, Willow went out of business. (*Id.* ¶ 5). In 2012, the Bank declared a default on the obligations of Baldwin and Willow under the agreements. (Compl. ¶ 31; Answer ¶ 31). On May 1, 2012, the parties executed a Forbearance and Modification Agreement. (Compl. ¶ 32; Answer ¶ 30). The agreement stated that it would terminate no later than July 15, 2012. (First Forbearance Agreement at 3).

On September 28, 2012, the Bank entered into a written agreement with defendants

---

[1] The answer and counterclaim included 412 pages of exhibits, which are incorporated in the pleadings and therefore may be considered by the Court in ruling on the motion to dismiss. *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (explaining that documents whose authenticity is "not disputed by the parties" and "documents sufficiently referred to in the complaint," among other categories, may be considered on a motion to dismiss).

Baldwin and Strasnick that relieved Willow of any further obligation to the Bank. (Compl. ¶ 30; Answer ¶ 30). That agreement did not relieve Baldwin or Strasnick of their obligations under the loans. (Compl. ¶ 30; Answer ¶ 30).

On October 31, 2012, following expiration of the first forbearance agreement, the parties executed a second such agreement. (Compl. ¶ 33; Answer ¶ 33). That agreement stated that it would terminate no later than September 30, 2013. (Second Forbearance Agreement at 2).

On October 4, 2013, an appraisal report of the Property was prepared for the Bank by Patriot Properties, Inc. (Countercl. at 39). The report appraised the Property at a value of $3.8 million. (*Id.*).

On March 27, 2014, the parties entered into a third forbearance agreement. (Compl. ¶ 36; Answer ¶ 36). That agreement stated that it would expire no later than June 26, 2014. (Third Forbearance Agreement at 5). On June 6, 2014, the agreement was amended to provide for an expiration date of July 30, 2014. (Compl. ¶ 37; Answer ¶ 37; Am. to Third Forbearance Agreement at 1). In addition, the amendment provided that, absent non-compliance with the terms of the agreement, the Bank would continue any foreclosure sale until August 6, 2014. (Am. to Third Forbearance Agreement at 2).

The amendment also states:

> Obligors do hereby acknowledge that upon the expiration of the Forbearance Period or in the event of any default under the Forbearance Agreement or this Amendment, the outstanding balance of the Loans shall be immediately due and payable without any requirement of notice to Obligors or further demand by Lender and Lender shall have no continuing obligation to forbear under this Agreement. Obligors hereby acknowledge that Lender is not obligated to further negotiate the terms and conditions of such repayment and that Lender shall have the right to pursue its remedies without further delay, in its sole discretion.

(*Id.* at 2).

3

As of June 17, 2014, Baldwin and Willow owed $2,151,083.67 in principal and a total of $3,505,65.60 including interest and fees. (Countercl. ¶ 9).

The third forbearance period expired on July 31, 2014, with an outstanding balance still owed under the loan agreements. (Compl. ¶ 38).[2]

On August 6, 2014, either Charles Patsios or a company known as Delphi Realty Associates made a written offer to Baldwin to purchase the Property for $3,250,000. (Countercl. ¶ 12).[3] According to the counterclaim, Delphi is a real estate brokerage and investment company with a current portfolio of properties worth approximately $14 million. (*Id.*). Delphi's offer contained no financing contingency; however, the offer was subject to contingencies for "full structural building inspection and review of title." (*Id.* & Ex. F). Patsios made a deposit of only $1,000, which would be forfeited if he did not fulfill his obligations under the agreement. The offer provided that a purchase and sale agreement was to be signed by September 11, 2014, and that Patsios would put down an additional $99,000 at the time of the purchase and sale. (*Id.* ¶¶ 12, 13 & Ex. F). Baldwin accepted the offer on August 7, 2014. (*Id.* ¶ 13 & Ex. F).

Upon accepting the Delphi offer, Baldwin and Strasnick informed the Bank of the offer and sought a further forbearance agreement. (*Id.* ¶ 15). As consideration, they offered additional security, including a mortgage on Strasnick's personal residence and two other properties. (*Id.*). The Bank rejected that offer and did not make a counteroffer. (*Id.* ¶ 16). Strasnick then offered to pay the Bank $25,000 per month until the sale to Delphi closed, in exchange for a forbearance through November 15, 2014. (*Id.* ¶ 17). The Bank rejected that offer

---

[2] Defendants have denied that allegation.

[3] The counterclaim alleges that the offer was made by Delphi; however, the actual written offer states that it was made by "Charles Patsios and/or nominee." (Countercl. Ex. F).

and did not make a counteroffer. (*Id.* ¶ 18).

On August 15, 2014, a notice appeared in the Lynn Item, a local newspaper, that the Bank would be selling the Property at foreclosure. (*Id.* ¶ 21). According to the counterclaim, Patsios saw the notice. (*Id.* ¶ 14, 21). The counterclaim alleges that Patsios was "disappointed" that the Bank would be foreclosing, because a foreclosure would prevent him from buying the property directly. (*Id.* ¶ 21). It further alleges that he remained interested in purchasing the property (through Delphi) at the foreclosure sale, in part because he recognized that the purchase price might be lower than that to which he had previously agreed. (*Id.* ¶ 22).

After reading the notice in the newspaper, Patsios contacted Sullivan & Sullivan Auctioneers, LLC, the company that was scheduled to conduct the foreclosure sale, in order to learn more about the Property and the foreclosure sale. (*Id.* ¶ 23). Patsios learned through Sullivan that a company called PBE Companies, LLC, had conducted an environmental study on the Property. (*Id.* ¶ 24). On August 14, 2014, the day before the scheduled foreclosure sale, he obtained a summary of the findings of that study through Sullivan. (*Id.*). The summary noted the existence of an alleged reportable environmental condition on the Property, but it did not specify the impact or extent of that alleged condition or indicate the potential cost that might would be required to remediate the alleged condition. (*Id.*). Patsios asked Sullivan for more detailed information about the environmental condition of the Property, but Sullivan did not provide him with any additional information. (*Id.* ¶ 33). Neither the Bank nor PBE provided Patsios with any estimate of the cost required to address the condition. (*Id.* ¶ 30).[4]

The documents provided to Patsios included a statement by PBE that it had no obligation

---

[4] The Bank has since stated that the condition would "require remediation and contingency expenses of up to $125,000 to correct." (Countercl. ¶ 30; Bokelkamp Aff. ¶ 11).

to report the condition to the Massachusetts Department of Environmental Protection, because it was neither the owner of the Property nor the lender. (*Id.* ¶ 25). Through his own independent research, Patsios allegedly discovered that PBE is a subsidiary of the Bank. (*Id.* ¶ 26).[5] Patsios allegedly concluded that it was "disingenuous" for the Bank to have commissioned an environmental study through its own subsidiary and then allowed the subsidiary to contend that it had no obligation to report the environmental condition because it was not the lender. (*Id.* ¶ 27). He did not know whether "the failure of PBE to report the reportable condition" could result in any liability, but he considered the risk of such liability to be "serious." (*Id.*). Further, he understood both from his own real estate experience and from Sullivan that the buyer of the Property would assume any liability associated with the Property. (*Id.* ¶ 28).

On August 15, 2014, the bank held a foreclosure sale of the Property. (*Id.* ¶ 31). The sale was attended by multiple potential bidders, each of whom was required to make a deposit of $75,000 to participate. (*Id.* ¶¶ 32, 35). In addition, the bank stipulated that the high bidder would be required to pay 10% of the final bid within five days of the sale and to pay the balance within 30 days. (*Id.* ¶ 35). According to the counterclaim, the typical deposit requirement for sales of similar properties was $10,000 to $15,000, and such sales were typically required to be closed within 45 days. (*Id.*).[6]

At the foreclosure sale, one potential bidder asked the bank's representative whether there were any water or sewer liens on the Property. (*Id.* ¶ 36). The representative allegedly

---

[5] PBE's relationship to the Bank was not disclosed to Patsios, either in the documentation provided to him or otherwise. (Countercl. ¶ 26).

[6] The amended complaint alleges that the Bank complied with all statutory notice requirements regarding the bidding requirements. (*See* Am. Compl. ¶ 40 (citing Mass. Gen. Laws ch. 244 § 14)). However, defendant has denied that allegation. (Answer ¶ 40).

responded that she did not know, but that any existing lien would be the responsibility of the buyer. (*Id.*).[7]

The auctioneer began the bidding for the Property at $1.5 million. (*Id.* ¶ 37). The bank made a bid for $1,503,000, and it successfully purchased the Property for that amount. (*Id.*).

Neither Delphi nor Patsios individually placed a bid on the Property at the auction. (*Id.* ¶ 33). According to the complaint, Patsios chose not to bid on behalf of either himself or Delphi for two reasons:

> First, he was concerned that if he were to purchase the Property, he would assume any liability the Bank, or PBE, incurred by failing to report the reportable condition at the Property to the DEP. Second, from the limited environmental report summary Sullivan provided to him, he had no idea what the scale of the environmental issue at the Property was.

(*Id.*).

## B. Procedural Background

Plaintiff filed its initial complaint against Baldwin and Strasnick on December 13, 2013, after the expiration of the second forbearance agreement and prior to the execution of the third forbearance agreement. The Court then granted a series of assented-to motions to extend the time given to defendants to respond to the complaint.[8] On August 21, 2014, the parties filed a joint motion to allow plaintiff to amend its complaint and to further extend defendants' response

---

[7] All such lien information is available to the public. *See* LYNN WATER & SEWER COMMISSION, http://www.lynnwatersewer.org/Forms/LWSC_Lien_Application.PDF.

[8] The first three such motions—filed on February 3, February 25, and March 17, 2014—each represented that the parties were engaged in settlement negotiations and that the requested extension could facilitate settlement. The fourth motion was filed on April 1; it noted that the parties had executed the third forbearance agreement on March 27, and it requested an extension until June 26 (the stated expiration date of that agreement). The fifth motion, filed on June 10, cited the amendment to the third forbearance agreement and accordingly requested an extension until July 31 (the day after the expiration date of the amended agreement). The sixth motion was filed on August 1, and requested an extension until August 22, to account for the possibility that defendants would be able to sell the Property and thereby resolve their debt.

deadline until after the filing of the amended complaint.

On August 26, 2014, plaintiff filed an amended complaint. Defendants answered and counterclaimed on September 9, 2014. Count 1 of the counterclaim alleges a breach of Mass. Gen. Laws ch. 93A; Count 2 alleges a breach of the implied covenant of good faith and fair dealing; Count 3 alleges a breach of the mortgagee's duty of good faith to obtain as large a price as possible" in conducting a foreclosure sale; Count 4 alleges intentional interference with advantageous contractual and business relations; and a second Count 4 [sic] seeks a declaratory judgment. On September 17, 2014, plaintiff moved to dismiss the counterclaim.

## II.     Legal Standard

On a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give . . . [the non-moving party] the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). However, "the tenet that a court must accept as true all of the allegations contained in a [pleading] is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, the pleading must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the [pleading] are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting

8

*Twombly*, 550 U.S. at 556). Dismissal is appropriate if the facts as alleged do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (alterations omitted) (internal quotation marks omitted).

## III. <u>Analysis</u>

### A. <u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>

Count 2 of the counterclaim alleges that the Bank breached the implied covenant of good faith and fair dealing by exercising its right to foreclose on the Property after defendants had offered to provide additional security for a further forbearance.

In Massachusetts, "[t]he covenant of good faith and fair dealing is implied in every contract." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). "The implied covenant of good faith and fair dealing provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1991) (internal quotation marks omitted). The obligation imposed by the duty of good faith and fair dealing specifically "concerns the manner of performance." *Uno*, 441 Mass. at 385. By contrast, the covenant may not "be invoked to create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Id.*

Here, the relevant contract between the parties was the amended version of the third forbearance agreement. That agreement expired on July 30, 2014. It specifically provided that upon the expiration of the agreement the Bank would "have no continuing obligation to forbear

9

under this Agreement" and that it would "have the right to pursue its remedies without further delay, in its sole discretion." (Am. to Third Forbearance Agreement at 2). Any forbearance obligation of the Bank under that agreement thus expired with the agreement, and the foreclosure sale in August 2014 did not "concern[] the manner of performance." *See Uno*, 441 Mass. at 385. Any further duty to forbear on the part of the Bank would be one "not otherwise provided for in the existing contractual relationship," and defendants therefore may not invoke the implied covenant of good faith and fair dealing to create such a duty. *See id.*

Put simply, the Bank had no obligation under the contract, or under the implied covenant of good faith and fair dealing, to give Baldwin more time to find a buyer for the property. That is true whether or not Baldwin had found a prospective buyer, and was willing to pay additional consideration in exchange for further forbearance. A bank has no obligation to accept anything less than full performance under the terms of its contract. *Williams v. GGF OY*, 417 Mass. 377, 382 (1994).

Accordingly, Count 2 of the counterclaim will be dismissed.

**B.      Intentional Interference with Advantageous Contractual Relations**

"To establish intentional interference with contractual or business relations, [a party] must show (1) the existence of a contract or a business relationship which contemplated economic benefit; (2) the [alleged tortfeasor's] knowledge of the contract or business relationship; (3) the [alleged tortfeasor's] intentional interference with the contract or business relationship for an improper purpose or by improper means; and (4) damages. *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 397 (1996) (citing *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 815-17 (1990)). A claimant "must not only prove that [the alleged

tortfeasor] intentionally interfered with his business relationship but also that [that party] had a duty of non-interference; *i.e.*, that he interfered for an improper purpose rather than for a legitimate one, or that [the party] used improper means which resulted in injury." *United Truck*, 406 Mass. at 816 n.8 (quoting *Straube v. Larson*, 287 Or. 357, 361 (1979)); *see also id.* at 816 (citing *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 209 (1978) for the proposition that a claim for intentional interference with contractual or economic relations "is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of interference itself").

Defendants contend that the Bank tortiously interfered with the contractual or business relationship that had formed between Baldwin and Delphi by proceeding with the foreclosure sale after Baldwin had accepted Delphi's offer to purchase the Property for $3.25 million. Three of the four elements of the tort appear to have been properly pleaded—the agreement between Strasnick and Delphi, as described in the counterclaim, represented a "contract or business relationship which contemplated economic benefit"; the Bank was expressly told of the agreement and thus had knowledge of it; and defendants allegedly suffered damages from the non-consummation of the sale to Delphi.

Under the circumstances, however, the Bank cannot have "intentionally interfered" with the Baldwin-Delphi relationship "for an improper purpose or by improper means." *See Swanset*, 423 Mass. at 391, 397. As to the Bank's alleged "improper purpose," the counterclaim simply alleges: "The Bank's intentional interference was improper, as its purpose was to prevent Baldwin and Dr. Strasnick's sale of the Property." (Countercl. ¶ 58). That allegation is deficient for two reasons.

First, stating that the Bank's purpose in interfering with the Baldwin-Delphi contract was to "prevent [defendants'] sale of the Property" is simply another way of stating that the Bank interfered with the sale intentionally. The Baldwin-Delphi contract was a contract for sale and nothing else; any party intentionally interfering with that contract would necessarily have the purpose of preventing the sale. But in order to prove tortious interference, "something more than intentional interference is required." *United Truck*, 406 Mass. at 815. Specifically, a claimant "must not only prove that [the alleged tortfeasor] intentionally interfered with his business relationship but also that [that party] had a duty of non-interference; *i.e.*, that he interfered for an improper purpose rather than for a legitimate one, or that defendant used improper means." *Id.* at 816 n.8.

Second, and more importantly, the Bank's purpose cannot have been improper. The counterclaim alleges that the Bank rejected defendants' offers to provide extra collateral in exchange for time to complete the sale to Delphi, never made a counteroffer, "never asked Dr. Strasnick and Baldwin any questions about Delphi's offer or about Delphi," and "proceeded to foreclose without explanation." (Countercl. ¶¶ 15-19). It further alleges that the Bank "would have suffered no loss or harm by agreeing to forbear from foreclosing." (*Id.* ¶ 20). Even accepting those facts as true, they do not establish an improper purpose. The Bank had a clear contractual and legal right to foreclose on the Property. Although it had a duty of good faith in conducting that foreclosure, it had no obligation to accept defendants' offer. The foreclosure rights of mortgage lenders would be considerably eviscerated if such foreclosures were deemed

to be tortious interferences with attempts by debtors to sell the property to others.[9]

For those reasons, the counterclaim has not sufficiently pleaded a claim for intentional interference with a contractual or business relationship. Accordingly, Count 4 of the counterclaim will be dismissed.

### C. Breach of the Mortgagee's Duty of Good Faith and Reasonable Diligence

In exercising a power of sale, a "mortgagee must act in good faith and must use reasonable diligence to protect the interests of the mortgagor." *Williams v. Resolution GGF Oy*, 417 Mass. 377, 382-83 (1994) (internal quotation marks omitted). Among other things, "the mortgagee has a duty 'to obtain for the property as large a price as possible.'" *Id.* at 383 (quoting *Clark v. Simmons*, 150 Mass. 357, 359 (1890). When the mortgagee seeks to purchase the property itself, its duty is even "more exacting"; it "will be held to the strictest good faith and the utmost diligence for the protection of the rights of [the mortgagor]." *Id.*; *Union Market Nat. Bank of Watertown v. Derderian*, 318 Mass. 578, 582 (1945) (quoting *Montague v. Dawes*, 96 Mass. 369, 373 (1867). Nonetheless, Massachusetts courts typically have not found a foreclosure sale to be invalid unless "the bad faith or failure of diligence has been of an active and conspicuous character." *Pemstein v. Stimpson*, 36 Mass. App. Ct. 283, 287 (1994).

A low purchase price at a foreclosure sale does not by itself indicate bad faith or lack of diligence. *Pemstein*, 36 Mass. App. Ct. at 287. "Nor does such an indication flow from the

---

[9] The Bank also contends that its motive for foreclosing could not have been improper, because it was acting to further its own economic interest. *See Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B.*, 62 Mass. App. Ct. 34, 38-39 (2004) ("Because the defendant's purpose was the legitimate advancement of its own economic interest, that motive is not 'improper' for purposes of a tortious interference claim."). Defendants dispute that contention, however, relying on the allegation in the counterclaim that "[t]he Bank would have suffered no loss or harm by agreeing to forbear from foreclosing." (Countercl. ¶ 20). The conclusory allegation, however, is not sufficient to create a reasonable inference that the Bank had some motive other than its financial self-interest.

13

circumstance that the mortgagee turns out to be the sole bidder at the foreclosure sale." *Id.* Furthermore, the mortgagor has the burden of proving that the foreclosure sale was not conducted properly. *Katz v. Winokur*, 13 Mass. App. Ct. 1020 (1982).

Defendants contend that the Bank "engaged in a constellation of bad faith conduct resulting in its obtaining the Property at a bargain basement price as the sole bidder at foreclosure." (Defs' Opp. at 15). Specifically, defendants contend that the Bank (1) failed to diligently pursue Strasnick's offer of additional security in exchange for further forbearance; (2) improperly extinguished Delphi's offer to purchase the Property for $3.25 million by proceeding with the foreclosure sale; (3) "chilled" Delphi or Patsios from bidding at the foreclosure sale by disclosing incomplete, yet troubling information about the reportable environmental condition on the property; (4) "chilled" other potential buyers by imposing overly stringent bidding requirements and failing to provide information about any outstanding water or sewer liens on the Property; and (5) purchased the Property for less than half the amount that had been offered by Delphi and more than two million dollars less than the value at which Patriot Properties, Inc., had appraised the Property.

As described above, the Bank had an absolute contractual right to pursue foreclosure. It had no duty either to forbear or to enter into a new forbearance agreement. And it was under no obligation to conclude that an offer of $3.25 million—secured by a deposit of only $1,000—provided a good reason to postpone the foreclosure sale. Its obligations to defendants—the duty of good faith and reasonable diligence, and the duty to "obtain for the property as large a price as possible"—applied specifically to the foreclosure sale itself and the conduct surrounding it. *See Clark v. Simmons*, 150 Mass. at 358 ("In determining whether, in a

particular case, a mortgagee has acted in good faith, and with a due regard for the interests of the mortgagor, the nature of his authority must be considered. He has a right, after giving the prescribed notices, to have the mortgaged property sold at auction for the payment of his debt. It is his duty, for the benefit of the mortgagor whom he represents, so to act, *in the execution of that power*, as to obtain for the property as large a price as possible.") (emphasis added). For that reason, and under the circumstances presented here, the Bank violated no duty to defendants by choosing to pursue foreclosure rather than a direct sale of the Property to Delphi or Patsios.

By contrast, the Bank could be liable if it engaged in bad-faith actions that effectively "chilled" a potential buyer, like Patsios, from bidding at the foreclosure sale. Defendants contend that the Bank's actions concerning the environmental disclosure report, the water and sewer liens, and the bidding requirements together improperly chilled the sale. The Court will consider each of those allegations in turn.

As to the environmental disclosure issue, defendants do not claim that the Bank made any misrepresentation of fact. Nor do they claim that it was improper to provide the environmental summary report to prospective bidders. Indeed, the Bank clearly could not have withheld that information, as that might have exposed it to liability for failure to disclose a material fact. *See, e.g., Nicholas McPickolus Realty Corp. v. Jamaica Plain Coop. Bank*, 16 Mass. App. Ct. 964 (1983) (finding "it would be contrary to sound policy to require the bank to keep the existence of a lis pendens from prospective buyers"). The counterclaim alleges that Patsios—but not Baldwin—thought that the Bank may have engaged in "disingenuous" conduct, because the environmental study had been commissioned through a subsidiary, and that this somehow permitted the Bank to evade its environmental reporting obligations. But in fact, the lender had

no such reporting obligation; under Massachusetts law, the lender's obligation to notify the Department of Environmental Protection of any reportable condition did not begin to run until it acquired ownership or possession of the property, at which point the lender was required to notify DEP within 120 days. *See Master MCP Q&A: 1993-2009*, MASS. DEP. ENERGY & ENVIRONMENTAL AFFAIRS, http://www.mass.gov/eea/agencies/massdep/cleanup/regulations/master-mcp-q-and-a-1993-2009.html ("For notification purposes, the 'clock starts to tick' on the date the lender acquires ownership or possession of the property."). Indeed, the report itself so stated, citing its source. (*Id.*).[10]

Similarly, the alleged failure to provide information concerning possible sewer or water liens cannot constitute a bad faith violation of the bank's obligations. That information was publicly available to anyone who wished to see it. Nothing that the Bank is alleged to have said or done would tend to prevent or even discourage any prospective purchasers from conducting a search to see if such liens existed.

The bidding requirements described in the counterclaim—a $75,000 deposit (5% of the opening bid) to participate, a 10% down payment within five days of the sale, and full payment within 30 days—do not, on their face, appear to be onerous. Indeed, courts have frequently upheld similar terms. *See, e.g., Guarino v. Farley*, 360 Mass. 873, 873 (1972) (finding that the mortgagee and other defendants in that case had "[done] nothing to chill the sale or stifle bidding" where plaintiff had reasonable notice of a 25 percent deposit requirement); *Richmond v.*

---

[10] Because the environmental report is "central to [defendants]' claim" and is "sufficiently referred to in the [counterclaim]," it may properly be considered in conjunction with a motion to dismiss. *See Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).

*Stanzler*, 327 Mass. 62, 63 (1951) (upholding a decision which had determined that a required down payment of $5,000 "was not exorbitant" in the context of a foreclosure sale of realty mortgaged to secure a $14,000 loan).

However, at this stage of the litigation and on the current record, the Court is unable to determine whether the bidding requirements were reasonable under the circumstances. Defendants have alleged, albeit in conclusory fashion, that the $75,000 deposit was "far higher than the typical $10,000 - $15,000 typical [sic] deposit on similar properties." (Countercl. ¶ 35). That may or may not be true, but the issue cannot be determined at this stage, without any factual record. The Court cannot simply take judicial notice that the bidding terms were reasonable, or make that conclusion as a matter of law.

Finally, defendants contend that the Bank's bad faith is evidenced by the fact that it purchased the Property at the foreclosure sale for $1,503,000—just under 40% of the price at which it had been appraised by Patriot Properties, Inc. in 2013. However, and as noted, "a low price is not, by itself, indicative of a breach of duty by the mortgagee, nor will a court presume bad faith or lack of diligence from the fact that the mortgagee is the only bidder on the property." *See RFF Family Partnership, LP v. Link Dev., LLC*, 932 F. Supp. 2d 213, 226 (D. Mass. 2013). Where a mortgagee "has done his full duty to the mortgagor in his conduct of the sale under the power, and the bidding begins, in his capacity as bidder a mortgagee may buy as cheaply as he can, and owes no duty to bid the full value of the property as that value may subsequently be determined by a judge or a jury." *Cambridge Sav. Bank v. Cronin*, 289 Mass. 379, 383 (1935). Courts have thus upheld similar differences between the appraisal value or alleged fair market value and the sales price. *See Resolution Trust Corp. v. Carr*, 13 F.3d 425, 430 (1st Cir. 1993)

("In canvassing Massachusetts case law, we find ample suggestion that a price deficiency of as much as 39 percent of fair market value can support the granting of a dispositive motion."); *Cronin*, 289 Mass. at 381, 383 (upholding a foreclosure sale in which the property had been valued at $51,000 and the mortgagee had purchased it for $20,000—in other words, a 39% sale); *see also FDIC v. Elder Care Servs., Inc.*, 82 F.3d 524, 527 (1st Cir. 1996) (upholding a sale of a property valued at $2 million for only $300,000, where the property was burdened with $1.1 million in back taxes and certain environmental hazards).

On its own, then, the pleaded difference between the purchase price and the appraisal value would be insufficient to establish bad faith or a lack of reasonable diligence. However, it is not irrelevant to such an inquiry, and conceivably could augment an inference of bad faith if defendants succeed in adducing evidence of improper conduct on the part of the Bank. In any event, the issue cannot be conclusively determined at this stage of the proceedings. *See Akar v. Fed. Nat. Morg. Ass'n*, 845 F. Supp. 2d 381, 400 (D. Mass. 2012) (holding that where plaintiffs had alleged, among other things, that defendant-mortgagee had "failed to act in good faith by selling the Property to itself in the foreclosure for less than the fair market value[, t]he question whether the plaintiffs may be able to prevail on these claims should be determined after the parties have had an opportunity to engage in discovery").

Accordingly, the motion to dismiss will be denied as to Count 3 of the counterclaim.

### D.     Breach of Mass. Gen. Laws ch. 93A

Defendants further allege that plaintiff engaged in unfair and deceptive actions in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A. "Conduct is unfair or deceptive if it is 'within at least the penumbra of some common-law, statutory, or other

established concept of unfairness' or 'immoral, unethical, oppressive, or unscrupulous.'" *Cummings v. HPG Int'l Inc.*, 244 F.3d 16, 25 (1st Cir. 2001) (quoting *PMP Assocs. Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975)).

Here, defendants' Chapter 93A claim turns on the facts underlying its other claims. Because the pleaded facts state a valid claim for breach of the mortgagee's duty of good faith and reasonable diligence, they also could support a finding that the Bank engaged in conduct that is "within at least the penumbra of some common-law . . . concept of unfairness." *See Cummings*, 244 F.3d at 25; *see also Williams*, 417 Mass. at 382-84 (evaluating liability under Chapter 93A using only the standard of good faith and reasonable diligence).

Accordingly, the motion to dismiss will be denied as to Count 1 of the counterclaim.

## IV. Conclusion

For the foregoing reasons, plaintiff's motion to dismiss the counterclaim is GRANTED as to Counts 2 and 4 and otherwise DENIED.

**So Ordered.**

Dated: April 17, 2015

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

19